IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TABITHA KENT,                          )
     Plaintiff,                       )
                                      )          NO. 2:05cv0037
v.                                     )          JUDGE HAYNES
                                      )
MASTERBRAND CABINETS,                  )
INC.,                                  )
     Defendant.                       )

## M E M O R A N D U M

Plaintiff, Tabitha Kent, a Tennessee citizen, filed this action under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e-3(a), ("Title VII"),  against the Defendant, MasterBrand

Cabinets, Inc., ("MasterBrand"), her former employer.  Plaintiff asserts a claim for retaliatory

discharge alleging that the Defendant fired her after she filed her pro se complaint of

discrimination in this district.  The Defendant filed an answer denying the Plaintiff's allegations

and the parties proceeded with discovery.

Before the Court is Defendant's motion for summary judgment, (Docket Entry No. 31),

contending in sum: (1) that Defendant properly assessed points under its no-fault attendance

policy; (2) that Plaintiff was not treated differently than similarly situated employees; (3) that

Plaintiff cannot establish the requisite causal connection between her August 2002 civil

complaint[1] and the termination of her employment in January 2003; (4) that Plaintiff cannot

establish that her supervisor subjected her to severe and pervasive harassment; (5) that

_____

    [1] This action, Kent v. MasterBrand Cabinets, Inc., case no. 2:02cv00057, was originally
filed in the Eastern District of Tennessee at Knoxville on July 26, 2002 and was transferred to
the Middle District of Tennessee on August 1, 2002.  This Court dismissed this action with
prejudice on January 26, 2004 due to Plaintiff's failure to prosecute.  For the purposes of this
memorandum, the Court will refer to August 1, 2002 as the filing date.

legitimate, non-discriminatory reasons exist to justify terminating Plaintiff; (6) that Plaintiff does not present any evidence that Defendant's reasons for terminating Plaintiff are pretextual.

In response, (Docket Entry No. 38), Plaintiff asserts that genuine disputes of material fact exist, rendering summary judgment inappropriate. In sum, Plaintiff contends: (1) that she has established a prima facie case of retaliation under Title VII of the Civil Rights Act of 1964; (2) that disparate treatment is irrelevant to Plaintiff's claim; (3) that the proof shows a causal connection between the filing of her civil complaint and her termination; (4) that Plaintiff is not complaining of "harassment" as defined in Title VII; and (5) that her proof shows that Defendant's explanations for her termination are pretextual.

For the reasons set fourth below, the Court concludes that Plaintiff has established a prima facie claim of retaliation. The Court further concludes that Plaintiff has demonstrated that Defendant's management made frequent inquiries about Plaintiff's Title VII complaint and Plaintiff's proof creates material factual disputes on the Defendant's administration of its No-Fault Attendance policy that at times were inconsistent with that policy.

## A. REVIEW OF THE RECORD[2]

MasterBrand manufactures kitchen and bathroom cabinetry. (Docket Entry No. 35, Plaintiff's Resp. to Defendant's Statement of Undisputed Material Facts, at ¶ 3). MasterBrand

---

[2] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986), app. 840 F.2d 16 (6th Cir. 1988) (unpublished opinion). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for a directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52, (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). There are material factual disputes and this section does not constitute findings of fact under Fed. R. Civ. P. 56(d).

hired Kent in February 1999 to work at its facility in Crossville, Tennessee. Id. at ¶ 1-2. The Crossville plant supplies lumber used for construction of cabinetry at MasterBrand's manufacturing plants. Id. at ¶ 4.

MasterBrand's Crossville facility has two sections, the machine room and the rough mill. (Docket Entry No. 30-3, Hildebrecht Affidavit at ¶ 13). MasterBrand employees generally consider the machine room to be a more desirable job assignment. Id. Kent originally worked in MasterBrand's "rough mill," but transferred to the "machine room" in 2001 after an alleged incident of harassment by Kent's then supervisor, Jeff Taylor. Id. at ¶ 14. Kent asserts that the harassment began when she requested special breast-feeding accommodations upon her return from maternity leave. (Docket Entry No. 35 at ¶ 17).

Dissatisfied with MasterBrand's response to her internal complaints, Kent filed a complaint of sexual harassment with the Equal Employment Opportunity Commission ("EEOC") in April 2002. (Docket Entry No. 55, Defendant's Response to Plaintiff's Statements of Undisputed Fact at ¶ 9). Shortly after Kent filed the complaint, the EEOC issued her a "right to sue" letter. (Docket Entry No. 1, Complaint at ¶ 9). In August, 2002, Kent filed her pro se action of sexual harassment against MasterBrand in this Court. Id. at ¶ 10.

Due to its popularity, transfers to the machine room from the rough mill are based on seniority. (Docket Entry No. 30-3 at ¶ 13). At the time of Kent's transfer, she had the least seniority of all the employees in the rough mill. (Docket Entry No. 42-8, Kent Affidavit at pp. 55-6). After her transfer, Kent's co-workers became upset citing Kent's minimal seniority and

3

complained to Scott Hildebrecht, MasterBrand's Human Resource Manager.[3] Id. at p. 55. After speaking with Kent, Hildebrecht decided to leave her in the machine room despite the complaints from other employees regarding her transfer. Id. Hildebrecht advised Kent that he would investigate her harassment complaint. Id. at p. 57.

According to Kent, about once a week or every other week, Hildebrecht asked her how she was doing in the machine room, or if anyone was bothering her. Id. at p. 60. When Kent inquired on the status of her complaint against Taylor, Hildebrecht responded that the matter was still under investigation. Id. at p. 61. Kent interpreted these contacts as Hildebrecht's attempt to induce her to stop pursing her Title VII action. Id. at p. 53. During these conversations, Hildebrecht asked on several occasions whether Kent was sure she "wanted to go through with it [the complaint]." Id. For example, when Kent first filed her claim:

> A. [H]e [Hildebrecht] called me into his office and asked me if I was sure I wanted to file suit because I hadn't retained my attorney at that time. I had just been to the EEOC, I think, on the discrimination.
>
> Q. He asked you that more than once or just on one occasion?
>
> A. I do believe more than one time.
>
> Q. How many times do you believe Scott [Hildebrecht] asked you about–
>
> A. Two or three. Until I finally did retain attorneys.
>
> Q. Okay. And am I correct that this would have been between the time you filed the charge in April and the time you filed the actual litigation that these conversations would have occurred.
>
> A. Yes.

---

[3] Scott Hildebrecht served as MasterBrand's human resource manager from February 2002 until September 2003. (Docket Entry No. 30-4 at ¶ 4).

4

\* \* \*

Q. Okay. Do you recall how you responded to those conversations?

A. I told him I was looking at my options and that I felt like the management had not done anything to discipline Jeff Taylor for his comments.

Id. at pp. 53-4. At their final meeting, Hildebrecht informed Kent that Taylor would not be fired for his alleged actions, but would be "rehabilitated" to avoid further incidents of harassment. Id. at p. 58.

A. ... I mean, he told me one time that to look at Jeff [Taylor], he had been there 13 years; he was a valuable employee; that, you know, like in the prison systems, you try to rehabilitate. And so they were trying to rehabilitate Jeff to where this issue would never reoccur.

Id. After that last meeting, Kent did not have further problems with Taylor. Id. at p. 62. Hildebrecht no longer inquired about Kent's EEOC complaint after she obtained counsel. Id. at p. 53.

During her employment at MasterBrand, Kent suffered from an anxiety disorder and in June 2002, Kent applied for and received medical leave under the Family and Medical Leave Act, 29 U.S.C. § 2601 et. seq. ("FMLA"), for mental health treatment. (Docket Entry No. 35 at ¶ 14). When she exhausted her FMLA leave in October 2002, Kent returned to her position at MasterBrand. (Docket Entry No. 1 at ¶ 16). In November 2002, Kent had a recurrence of her mental distress and anxiety. Id. at ¶ 17. On November 8, 2002, Dr. Stephen Moore, Kent's psychiatrist, requested that MasterBrand reduce Kent's work week to 32 hours per week for the next three months to accommodate her mental health condition. (Docket Entry No. 55 at ¶ 22).[4]

---

[4] According to Kent, Hildebrecht verbally approved her 32 hour work week prior to the December 13, 2002 letter. (See Docket Entry No. 42-8 at p. 83 and Docket Entry No. 30-4 at ¶¶ 25, 28).

5

MasterBrand requested that Kent supply additional information regarding her diagnosis and treatment. (Docket Entry No. 1 at ¶ 19).

On December 6, 2002 Patricia Guthrie, a social worker, also requested an accommodation by asking MasterBrand to limit Kent's schedule to two consecutive days. Id. at ¶ 33. In a December 13, 2002 letter, Hildebrecht advised Kent that her schedule to work is Monday, Tuesday, Thursday and Friday or two days of work followed by one day off from work. (Docket Entry No. 30-4 at ¶ 29). Kent's non-FML work reduction was granted on December 13, 2002 despite MasterBrand's new policy, effective January 1, 2003 not to allow non-FML leave on an intermittent or reduced work schedule basis. Id. at ¶ 28.

MasterBrand considers attendance an "essential aspect" of employment because absenteeism can adversely impact "both the efficiency and volume of production." (Docket Entry No. 35 at ¶ 5). In 2002, MasterBrand instituted a "No-Fault Attendance Policy" at its Crossville plant. MasterBrand distributed the new policy to each employee. Id. at ¶ 11. Kent received a copy of the policy during a plant-wide meeting on October 1, 2002. Id. at ¶ 12. MasterBrand's policy states:

> [MasterBrand-Crossville's] new attendance policy attempts **to strike a fair balance between business needs and personal time needs of employees** such as doctor's appointments or family emergencies. MasterBrand recognizes that an occasional absence, tardiness or early leave may be unavoidable and does reflect poorly upon conscientious employees. However, where absences and tardiness exceed the allowed limits, **corrective action will result.** Corrective action will follow a progressive process: a counseling discussion, a verbal warning, a final warning ("written") and discharge...

(Docket Entry No. 42-4, MasterBrand Policy/Procedure, p. 18) (emphasis supplied).

Under its policy, MasterBrand assesses point values against employees who: (1) arrive to work after his/her shift begins; (2) leave before his/her shift is over; (3) employees who do not

6

come to work after notifying a supervisor before his/her shift begins; and (4) employees who are "no call/no show." Id. at p. 19. The point assessment ranges from 1/4 point to 2 points depending on the infraction. Id. Once an employee accumulates seven points, the employee is discharged. Id. Points are not assessed against employees for approved absences from work such as: jury duty/witness leave; military leave; HR approved personal leave; funeral leave; Family and Medical Leave (FMLA); non-FML medical leave; approved short term or long term disability; days lost due to a work related injury; voluntary firefighters and emergency medical technicians called to duty; and school visitation leave. Id. All other partial or full absences are subject to the seven point assessment system.

MasterBrand has mandatory and voluntary overtime. (Docket Entry No. 42-8 at p. 64). Mandatory overtime is a seniority-based system that requires employees to work extra hours during times they are not regularly scheduled to work. Id. For voluntary overtime, MasterBrand first solicits volunteers and if necessary assigns additional employees based on seniority. Id.

On Saturday, November 9, 2002, MasterBrand scheduled mandatory overtime. (Docket Entry No. 35 at ¶ 28). On Friday, November 8, 2002, Hildebrecht directed Brenda Roysden, Kent's supervisor, to telephone Kent at her home and advise her that MasterBrand required her to report to work on Saturday, November 9, 2002. (Docket Entry No. 55 at ¶ 17 and Docket Entry No. 30-4 at ¶ 19). Kent did not report to work on November 9, 2002. (Docket Entry No. 35 at ¶ 29). Hildebrecht had originally assessed an attendance point against Kent for this absence, but later rescinded the attendance point when Kent objected to the assessment. (Docket Entry No. 55 at ¶ 18).

On Thursday, November 21, 2002, Hildebrecht called Kent into his office after her shift

7

ended and told her that MasterBrand required her to report to work on Saturday, November 23, 2002 for mandatory overtime. (Docket Entry No. 55 at ¶ 24). Kent did not work the mandatory overtime on Saturday, November 23, 2002. Id. at ¶ 29. It is disputed whether Hildebrecht's post-shift notification on Thursday, November 21, 2002 constituted adequate notice requiring Kent to report to work that Saturday. Id. at ¶ 25. It is also disputed whether working this overtime would have put Kent over her 32 hour per week work restriction that was in effect at this time. Id. at ¶ 30. Hildebrecht assessed an attendance point against Kent for her failure to report to work on Saturday, November 23, 2002, bringing her total point accumulation to three points. Id. at ¶¶ 31, 33. Kent received a fourth point for an absence on December 16, 2002 and subsequently had to attend a counseling session under the No-Fault attendance policy. (Docket Entry No. 42-8 at p.80).

In mid-December, 2002, Kent learned that her husband's grandmother suffered from terminal cancer. Id. at ¶ 38. Kent had a very close relationship with her husband's grandmother. Id. Upon learning of her husband's grandmother's condition, Kent approached Hildebrecht to discuss her options for time off upon the death of her husband's grandmother. Id. at ¶ 39. Hildebrecht made several suggestions, but refused to allow Kent to complete the paperwork necessary for their approval. Id. Kent's husband's grandmother died in the early morning of January 6, 2003. Id. at ¶ 42.

On January 6, 2003, Kent telephoned MasterBrand to inform her supervisors that she would be absent on that day, in compliance with the No-Fault attendance policy. Id. at ¶ 43. Hildebrecht assessed a fifth attendance point against Kent for her absence on January 6, 2003. Id. at ¶ 44. On January 7, 2003, Kent telephoned MasterBrand to inform her supervisor of

8

another absence. Id. at ¶ 47. Kent alleges that she attempted to telephone her supervisor before the start of her 6:30 a.m. shift, but was unable to reach anyone and did not leave a voice mail message. Id. However, Kent finally left a voice mail message for her supervisor at 7:00 a.m., thirty minutes after her shift started. Id. Hildebrecht assessed a sixth attendance point against Kent for this absence. Id. at ¶ 48.

On January 7, 2003, Hildebrecht telephoned Kent at her home to inform her that MasterBrand expected her to report to work the next day, Wednesday, January 8, 2003, despite Hildebrecht knowledge that Kent's husband's grandmother's funeral was to be held that day. Id. at ¶¶ 50, 55. Even though Kent was not scheduled to work on Wednesday, January 8, 2003, Hildebrecht told her to report to work "because she had not worked the previous two days, she needed to report to work on Wednesday, January 8[th], to avoid accumulating her seventh attendance point," terminating her employment. Id. at ¶ 53. Kent did not report to work on January 8, 2003 and accumulated her seventh attendance point. Id. at ¶ 57. MasterBrand terminated Kent's employment on January 13, 2003 under MasterBrand's No-Fault Attendance policy. Id. at ¶ 58.

Kent contests the assessment of points on November 23, 2002 and January 8, 2003. (Docket Entry No. 42-8 at p. 158). MasterBrand asserts that there were several instances in which points could have been assessed against Kent, but were not, in an effort to give her "the benefit of the doubt." (See Docket Entry No. 30-4 at ¶¶ 22 and 33). Specifically, Hildebrecht believes he could have assessed points against Kent for her absence on Saturday, November 9, 2002. Id. at ¶ 22. In addition, Hildebrecht contends that he would have been justified to assess two points against Kent as a "no-call/no-show" on Tuesday, January 7, 2003 for failing to notify

her supervisor of her absence prior to the start of her shift.  Id. at 32.  It should be noted that had Hildebrecht assessed two points against Kent for her absence on January 7th, she would have accumulated her seventh point under the No-Fault policy on that day instead of January 8th.  Id.

On September 4, 2003 Kent filed a charge of retaliation in violation of Title VII with the EEOC, in regard to her termination and the events leading up to her termination.  (Docket Entry No. 55 at ¶ 65 and Docket Entry No. 42-3 at p. 14).  On November 2, 2004 the EEOC issued a probable cause determination against MasterBrand.  Id. at ¶ 66.  Kent initiated the instant action on April 25, 2005.

### B.  CONCLUSIONS OF LAW

"The very reason of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989).  Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that she had to come forward with all of her evidence."  Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986).  Accord, Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary
> judgment 'shall be rendered forthwith if the pleadings, depositions, answers to
> interrogatories, and admissions on file, together with the affidavits, if any, show
> that there is no genuine issue as to any material fact and that the moving party is
> entitled to a judgment as a matter of law.'  By its very terms, this standard
> provides that the mere existence of some alleged factual dispute between the
> parties will not defeat an otherwise properly supported motion for summary
> judgment; the requirement is that there be no genuine issue of material fact.

10

> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in the original and added in part). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no `genuine issue for trial.'" Matsushita Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties as described by the Court in Celotex

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n. 4 (6th Cir. 1986). The moving

11

party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991)(quoting Kochins v. Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of `demonstrating the absence of a genuine issue of material fact,' the nonmoving party then `must set forth specific facts showing that there is a genuine issue for trial.'" Emmons v. McLaughlin, 874 F.2d 351, 353 (6th Cir. 1989) (quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the Court of Appeals warned that "[t]he respondent must adduce more than a scintilla of evidence to overcome the motion [and]. . . must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)(quoting Liberty Lobby). Moreover, the Court of Appeals explained that

> The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.'

Street, 886 F.2d at 1480 (cites omitted). See also Hutt v. Gibson Fiber Glass Products, No. 89-5731 (6th Cir. filed September 19, 1990) ("A court deciding a motion for summary judgment must determine `whether the evidence presents a sufficient disagreement to require a submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." quoting Liberty Lobby)).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

12

More important for present purposes, <u>summary judgment will not lie if the dispute about a material fact is 'genuine' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party</u>.

\* \* \*

Progressing to the specific issue in this case, we are convinced that <u>the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits</u>. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, <u>the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented</u>. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. <u>The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed</u>.'

<u>Liberty Lobby</u>, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

[I]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute. . . .'

<u>Bohn Aluminum & Brass Corp. v. Storm King Corp.</u>, 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." <u>Duchon v. Cajon Company</u>, 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a

13

summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establishing a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions

> 1.     Complex cases are not necessarily inappropriate for summary judgment.
>
> 2.     Cases involving state of mind issues are not necessarily inappropriate for summary judgment.
>
> 3.     The movant must meet the initial burden of showing `the absence of a genuine issue of material fact' as to an essential element of the non-movant's case.
>
> 4.     This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.
>
> 5.     A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed

14

verdict motion is the same: `whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that the party must prevail as a matter of law.'

6.     As on federal directed verdict motions, the `scintilla rule' applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.     The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.     The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must `present affirmative evidence in order to defeat a properly supported motion for summary judgment.'

9.     The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.    The trial court has more discretion than in the `old era' in evaluating the respondent's evidence. The respondent must `do more than simply show that there is some metaphysical doubt as to the material facts.' Further, `[w]here the record taken as a whole could not lead a rational trier of fact to find' for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is `implausible.

Street, 886 F.2d at 1479-80.

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

Under Title VII an employer cannot retaliate against an employee who engages in any

15

activity protected under Title VII.  42 U.S.C. § 2000e-3(a).  Title VII's prohibition against retaliation extends to the employee's opposition to any unlawful employment practice and the employee's participation in an investigation, proceeding or hearing under Title VII.  Id.  Kent's claim is that MasterBrand retaliated against her by terminating her employment after she filed her August 2002 complaint.

To establish a prima facie case of retaliation, Kent must show: (1) that she engaged in an activity protected by Title VII; (2) that the exercise of her civil rights was known to the MasterBrand; (3) thereafter MasterBrand took an employment action adverse to Kent; and (4) that there was a causal connection between the protected activity and the adverse employment action. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir.2000).  The first three elements of the prima facie case are undisputed in this matter.  The disagreement amongst the parties is whether Kent can establish a causal connection between the protected activity– the filing of her complaint on August 1, 2002, and the adverse employment action– the termination of her employment on January 13, 2003.

"To establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not filed a discrimination action."  Id.  Thus, Kent must put forth sufficient evidence to create an inference that MasterBrand assessed attendance points against her for her absences on November 23, 2002 and January 8, 2003 *because* she filed a complaint in August 2002 and would not have done so otherwise.

"A causal link can be shown by either of two methods: (1) through direct evidence; or (2) through knowledge coupled with a closeness in time that creates an inference of causation...

16

However, temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling evidence." Id. (citation omitted).

Kent asserts that a phrase contained in MasterBrand's January 13, 2003 termination letter is direct evidence of retaliatory animus. The letter confirms an earlier meeting that day between Kent and Hildebrecht and states: "[y]our failure to return to work on Wednesday [January 8, 2003] is a reflection of the poor attitude you have exhibited since you filed your lawsuit against the company." (Docket Entry No. 42-3, Termination Letter at p. 2). Kent insists that this statement proves retaliatory animus and establishes the needed causal relationship.

MasterBrand contends that Kent takes the language out of context and ignores the remainder of the paragraph which states:

> While you have the right to pursue your claim this does not give you the right to disregard the rules that apply to all employees. In order to be a productive employee, you must be prepared to work on a regular and consistent basis. To the contrary, work has not been a priority for you as you continually find ways to gain additional time off. On a related note, your conduct and behavior during our phone conversation Tuesday was inappropriate. Your statements to myself and Nancy included: "I don't give a shit about my job" and "I don't give a shit about you." This blatant disrespect for management is unacceptable and will not be tolerated.

Id.

The circumstantial evidence is that this letter follows the multiple conversations between Hildebrecht and Kent in which Hildebrecht questioned Kent regarding whether she was "sure she wanted to go through" with her complaint. During the five-month period between her complaint and termination, Hildebrecht has used Kent's complaint as a starting point of conversation several times, that Kent argues, creates the inference that his actions were motivated by her complaint.

17

"[A]t the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." Nguyen, 229 F.3d at 566 (citing EEOC v. Avery Dennison Corp., 104 F.3d at 861). Because the burden is minimal and the Court is required to make all reasonable inferences in favor of the nonmoving party, Court finds that Plaintiff has put forth sufficient evidence to establish a prima facie case of retaliation.

Once a Title VII plaintiff establishes a prima facie case of retaliation, the McDonnell Douglas burden shifting framework applies:

> Under the McDonnell Douglas scheme, "[e]stablishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094 (1981). To establish a "presumption" is to say that a finding of the predicate fact (here, the prima facie case) produces "a required conclusion in the absence of explanation" (here, the finding of unlawful discrimination). 1 D. Louisell & C. Mueller, Federal Evidence § 67, p. 536 (1977). Thus, the McDonnell Douglas presumption places upon the defendant the burden of producing an explanation to rebut the prima facie case- *i.e.*, the burden of "producing evidence" that the adverse employment actions were taken "for a legitimate, nondiscriminatory reason." Burdine, 450 U.S. at 254, 101 S.Ct., at 1094. "[T]he defendant must clearly set forth, through the introduction of admissible evidence," reasons for its actions which, if believed by the trier of fact, would support a finding of unlawful discrimination was not the cause of the employment action. Id., at 254-255, and n. 8, 101 S.Ct., at 1094-1095, and n. 8. It is important to note, however that although the McDonnell Douglas presumption shifts the burden of production to the defendant, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff. Burdine, 450 U.S. at 253, 101 S.Ct., at 1093.

St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506-5-7, 113 S.Ct. 2742, 2747 (1993).

Here, MasterBrand's proof is that Kent was discharged because she accumulated seven points under its No-Fault Attendance policy. MasterBrand assessed points against Kent only for

dates she did not report to work after being scheduled and/or asked to work.  MasterBrand

asserts that the seven point limit could have been reached before January 8, 2003, but

MasterBrand gave Kent "the benefit of the doubt" on several occasions.  Thus, the burden shifts

back to Kent to demonstrate that MasterBrand's explanation for her discharge is pretext for

discrimination.  See Braithwaite v Timken Co. et al., 258 F.3d 488 (6th Cir.2001).

     In Balmer v. HCA, Inc., 423 F.3d 606 (6th Cir.2005), the Sixth Circuit set forth the

requirements to establish pretext:

> The plaintiff must produce sufficient evidence from which the jury could
> "reasonably reject [the defendants'] explanation" and infer that the defendants
> "intentionally discriminated" against her.  Woythal v. Tex-Tenn Corp., 112 F.3d
> 243, 246-47 (6th Cir.1997).  The plaintiff must submit evidence demonstrating
> that the employer did not 'honestly believe' in the proffered non-discriminatory
> reason for its adverse employment action.  To inquire into the defendant's "honest
> belief," the court looks to whether the employer can establish "reasonable
> reliance" on the particularized facts that were before the employer when the
> decision was made.  Smith v. Chrysler, 155 F.3d 799, 806-7 (6th Cir.1998).
>
>                                      * * *
>
> If there is no reasonable dispute that the employer made a "reasonably informed
> and considered decision" that demonstrates an "honest belief" in the proffered
> reason for the adverse employment action, the case should be dismissed since no
> reasonable juror could find that the employer's adverse action was pretextual.
> See Braithwaite v. Timken Co., 258 F.3d 488, 494 (6th Cir.2001).

Id. at 614.

     Kent asserts that Hildebrecht purposefully manipulated the No-Fault policy to terminate

her employment in retaliation for her complaint against MasterBrand.  Kent's cites the

assessment of the attendance point for Saturday, November 23, 2002 as evidence of pretext.  On

this day, MasterBrand invoked mandatory overtime and expected Kent to report to work.  Kent

contends that because she was not given adequate notice by noon on Thursday, November 21st,

19

company rules did not require her to work. Hildebrecht notified Kent that MasterBrand required her to work on November 23rd after her shift had ended at 2:30 p.m. on Thursday, November 21st. (Docket Entry No. 42-8 at p. 69). According to Kent, other employees expected to work that Saturday were notified the preceding Tuesday or Wednesday. Id. MasterBrand explained to the EEOC investigator, "employees are notified regarding Saturday mandatory overtime on Thursdays before noon." (Docket Entry No. 42-3 at p. 5).

Kent also asserts that working on November 23rd would have exceeded her 32-hour work restriction. MasterBrand responds that Kent did not work full shifts in the work week preceding Saturday, November 23rd and could have worked 2.75 hours that day before exceeding her 32 hour work week restriction. (Docket Entry No. 42-3 at p. 5). Yet, Hildebrecht assessed Kent an entire point, the equivalent to missing an entire eight hour shift as opposed to a ½ point assessment, the value for missing up to four hours of work. (Docket Entry No. 42-4 at p. 19).[5] Thus, Hildebrecht's notice may not comply with MasterBrand policy, creating a material factual dispute whether Hildebrecht properly assessed Kent under MasterBrand's point system for attendance for that date.

Kent next argues that the assessment for her absence on Wednesday, January 8th was pretext for discrimination because Wednesdays were her scheduled day off. Hildebrecht insists that Kent's work restriction did not necessitate having Wednesday, January 8th off when

---

[5] The Court cannot substitute its judgment for Defendant's on the assessment, but rather Kent must demonstrate that MasterBrand's policy may have been ignored or inconsistently applied to Plaintiff. See Bush v. American Honda Motor Co., Inc., 227 F.Supp.2d 780,797 (S.D. Ohio 2002) (stating the Court should not sit as a super personnel department to second guess an employer's facially legitimate business decision" and is not to "overturn an employment decision even if the Court might have acted differently had it been the employer.")

she did not work the previous two days. (Docket Entry 30-4 at ¶ 35). Yet, when Kent missed a work day before Wednesday, she was not required to come to work on Wednesday to make up that lost day. Kent notes that she was off from work on Monday, December 16, 2002 because her son was ill, but Hildebrecht did not ask or require her to work on Wednesday, December 18, 2002 even though her work restriction would allow such a substitution. (Docket Entry No. 42-8 at p. 91). In Hildebrecht's view, Kent should have been required to work on any Wednesdays when Kent missed a previous Monday or Tuesday, as she was required to do the day of her husband's grandmother's funeral.

Additionally, Kent contends that the point assessed for Wednesday, January 8th was improper because she qualified for leave and Hildebrecht denied her that leave. As human resource manager, Hildebrecht was "familiar with and administered" MasterBrand policies as part of his ordinary duties. (Docket Entry No. 30-4 at ¶ 6). According to Kent, Hildebrecht informed her that she did not qualify for funeral leave under MasterBrand's policy for leave.

> Q. Had you had conversations with...Scott Hildebrecht, prior to your husband's grandmother dying, about whether or not she would be covered under the funeral leave policy?
>
> A. Yes.
>
> * * *
>
> A. ... I asked him, you know, the leave that I could take, and he told me I could take something, if I filled out the paper work. I don't remember the name of it. But I– she didn't qualify for the grievance leave because she wasn't my grandmother. She was just an in-law. But he said he wasn't there to make it hard on me and that I could fill out papers and request unpaid time off or something like– I'm not for sure what it was called.
>
> * * *
>
> Q. And Scott told you that essentially a grandmother-in-law, or your husband's

grandmother, would not be covered under the funeral leave policy, correct?

A.  Correct.  But he said I could take something else, and I cannot remember what it's called.

(Docket Entry No. 42-8 at pp. 140-142).  In a memorandum in Kent's file dated January 7, 2003, Hildebrecht noted on the "funeral leave issue":

> Regarding the question of Funeral Leave, Ms. Kent was informed several times (including a meeting between Mr. Hildebrecht and Ms. Kent that occurred one month prior to January 6) that Grandparent-in-laws were not covered under MBCI's Funeral Leave Policy.

(Docket Entry No. 54).

Kent insists that after her husband's grandmother's death, Hildebrecht did not allow her to fill out the appropriate paperwork to obtain any type of leave.  Id. at p. 151.  MasterBrand's Funeral Leave policy provides for Plaintiff's situation.

> MBCI [MasterBrand] provides paid Funeral Leave in order to allow employees time off work due to the death of an Immediate Family Member.  Immediate Family Member is defined as: Mother/Father, Spouse, Brother/Sister, Step Mother/Father, Child(ren), Step Brother/Sister, Grand Parents, Step-Child(ren), Brother/Sister-in-law, Mother/Father-in-law, Legally Adopted Child(ren), Son/Daughter-in-law, Step Mother/Father-in-law, Grand Child(ren).  Funeral leave where the relationship is to the employee's spouse will be limited to the Immediate Family Members of the employee's current spouse.

(Docket Entry No. 42-4 at p. 12 (emphasis added)).

Finally, Kent received one day of paid vacation on a post-termination check after Hildebrecht told her that she had no more vacation days available.  (Docket Entry No. 42-11, Employee Information 12/31/02-1/13/03 and Docket Entry No. 42-8 at pp. 110-114).

The Court concludes that a jury could reasonably conclude that MasterBrand's proffered reasons for the point assessments on November 23, 2002 and January 8, 2003 were pretextual.  A jury could conclude  Hildebrecht, the Human Resource Manager charged with administering

MasterBrand policy purposefully misapplied the policy to Plaintiff and used the No-Fault

Attendance policy to mask his discriminatory animus toward Plaintiff's Title VII complaint.  The

Court further concludes that material factual disputes exist on whether the Defendant's stated

reasons for Plaintiff's termination were legitimate.  Thus, the Court concludes that Defendant

MasterBrand's motion for summary judgment (Docket Entry No. 31) should be denied.

 An appropriate Order is filed herewith.

**ENTERED** this the ___31^st___ day of January, 2007.

         WILLIAM J. HAYNES, JR.
         United States District Judge

23